1

2

3

4

5

6

7

8                        IN THE UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10   STEPHEN ANTHONY LONG,

11           Petitioner,                    No. CIV S-08-0597 FCD CHS P

12       vs.

13   R. BARNES, et al.,

14           Respondents.            FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.    INTRODUCTION

17           Petitioner Stephen Long is a state prisoner proceeding pro se with a petition for

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner attacks his conviction in the

19   Shasta County Superior Court, case number 04F2750, for second degree murder, gross vehicular

20   manslaughter while intoxicated, and failure to stop at the scene of an accident causing death.

21   II.   CLAIMS

22           Petitioner claims that:

23           A.    The trial judge improperly instructed the jury regarding consciousness;

24           B.    The trial judge improperly instructed the jury regarding intoxication;

25           C.    The prosecutor committed misconduct;

26           D.    The trial court erred in denying a motion for a new trial; and

                                            1

1          E.      The trial court unconstitutionally shackled him during trial.

2          Upon careful consideration of the record and the applicable law, the undersigned

3   will recommend that petitioner's petition for habeas corpus relief be denied.

4   III.    FACTUAL AND PROCEDURAL BACKGROUND

5          A.      Facts[1]

6              On April 10, 2004, at approximately 11:15 p.m., Jana Barletto was
               driving southbound on Airport Road in Shasta County.  A silver
7              pickup truck suddenly came up close behind her.  A double yellow
               line separated the road's two lanes.  The truck crossed the double
8              line into the northbound traffic lane and passed Barletto at a speed
               much higher than the road's posted speed limit of 50 miles per
9              hour.

10             Norman Tomlinson pulled onto southbound Airport Road, and
               noticed a vehicle ahead of him cross the double line and pass a
11             couple of cars at a high rate of speed.  Ryan King was driving
               southbound on a frontage road next to Airport Road at about 70
12             miles per hour.  A silver Chevy pickup truck on Airport Road
               passed him.  Both Tomlinson and Ryan saw a cloud of dust as the
13             truck's passenger side went over the road's edge where the road
               curved to the left before it intersects with Meadow View Road.
14
               At the same time, Paul Saunders was driving northbound on
15             Airport Road south of the intersection with Meadow View.
               Saunders was driving at about 55 miles per hour behind a Camaro.
16             As the two cars approached the intersection, Saunders saw a silver
               truck speeding towards him.  As the Camaro was reaching the
17             intersection, the truck failed to negotiate a curve and veered off the
               corner of the intersection to its right a couple of feet.  Then the
18             truck cut back across Airport Road through the middle of the
               intersection into the northbound lane, and hit the Camaro head on.
19
               Saunders braked hard and swerved as the truck spun past him.
20             Saunders got out of his car and ran into the intersection to stop
               traffic.  He saw the driver of the pickup truck get out of the
21             vehicle. The driver stumbled first to the back of the truck, then
               over to the Camaro.  Saunders yelled at the driver to see if he was
22             okay and if the person in the Camaro was okay.  The driver did not
               answer. The driver stumbled up to the Camaro, stuck a hand into it,
23             brought his hand back out, then circled the Camaro.  By this time,
               the Camaro was on fire.  Saunders had to turn around to stop more

24
         ───────────────────────
25             [1] This statement of facts is taken from the November 6, 2006, unpublished opinion by the
26   California Court of Appeal for the Third Appellate District (hereinafter Opinion), filed with
     respondent's answer as Lodged Document 4.

                                           2

traffic. When he looked back, the pickup driver was gone.

Tomlinson arrived at the scene about one minute after seeing the pickup truck passing cars ahead of him. The Camaro was on fire. Tomlinson saw a male inside the car who appeared unconscious. He tried to kick dirt onto the flames. He saw a person wearing a white shirt and shorts face the truck, then walk to the Camaro and peer in. A few moments later, the man was gone. Tomlinson saw a person wearing a white shirt and shorts walking away from the scene down Airport Road.

Tomlinson called 911. He could not get the unconscious driver out of the Camaro. He reached in and touched the driver's neck to detect a pulse. He felt nothing.

King witnessed the accident and also called 911. Barletto also arrived on the scene. She saw the Camaro on fire, and also saw the silver pickup truck that had passed her. She and others helped put the fire out using bottled water from her car and a fire extinguisher.

It took more than an hour for fire personnel to extract the driver from the Camaro. He was identified from his driver's license as 17-year-old Travis Bosse, and was pronounced dead at the scene. The victim sustained numerous lacerations, abrasions and contusions on his head and body, and died of multiple blunt force injuries to multiple organs.

Upon arriving at the scene, the police could not find the driver of the pickup truck. They determined the truck was registered to defendant. Saunders gave police a description of the driver and told them he could recognize him if he saw him again.

At about 1:11 a.m., Deputy Sheriff Tyler Thompson came upon defendant, who was walking down the middle of Meadowlark Road. Defendant was wearing a T-shirt and shorts. The shirt was torn and had dried blood markings on it. Defendant had lacerations on his arms and legs. His eyes were red and watery, his speech was slurred, and his breath smelled of alcohol. Defendant stated he had lost his wallet earlier that day at the Win-River Casino, and he was looking for it. He asked if the officers had found it.

Officers brought Saunders to the location where defendant was detained, and Saunders identified defendant as the driver of the silver truck that collided with the Camaro. Defendant conceded at trial he was responsible for the accident and the victim's death.

A blood sample was taken from defendant at 2:35 a.m., approximately three hours after the accident. The sample had a blood-alcohol concentration of .12 percent. A criminalist testified a blood-alcohol level of .12 percent would be consistent with a 190-pound man drinking eight beers in an hour. Defendant's level would actually have been higher at the time of the accident. With

3

a level of .12 percent, a person would be too impaired to drive a motor vehicle safely.

After his arrest, defendant informed officers he showed a vehicle at a car show that day at the Win-River Casino from 9:00 a.m. to 4:00 p.m.  He drank four 12-ounce beers at the show between noon and 4:00 p.m.  His wallet was lost there, so he called credit card companies and his bank when he arrived home.  He sat down to watch television, and then did not remember anything until he met the police while walking towards his parents' house.  He did not know how he got his injuries.  He stated his vehicles were at home.  He also stated he did not consume any alcohol after leaving the casino.

Officers told defendant a witness had identified him as the person in a silver truck that collided with a Camaro on Airport Road and then left the scene.  Defendant insisted he could not have done that. He maintained he had not driven that evening.  Officers explained he had killed a 17-year-old boy.  Defendant continued to state he had not driven that night and did not remember a collision.

The surveillance videotape from the Win-River Casino depicted defendant attending a car show held at the casino's parking lot on April 10, 2004.  He arrived at 8:12 a.m.  The tape recorded defendant going to the security office to report his lost wallet.  At 3:32 p.m ., defendant went to a bar in the casino.  He left the casino property at 3:51 p.m.

Two bartenders from the Hen House, a bar in Redding testified at trial.  The first, Lisa Tafoya, worked the day shift on April 10, 2004.  She testified defendant came into the bar alone around 5:00 p .m. on the day of the accident.  Tafoya allowed defendant to cash a check for $10 because he said his wallet had been stolen or lost at a car show.  She served defendant two bottles of beer before her shift ended at 6:00 p.m.

The second bartender, Donna Schulte, replaced Tafoya at 6:00 p.m. She, too, cashed a check for defendant, this one in the amount of $20.  She served defendant five 12-ounce beers.  Defendant did not finish the fifth.  He left the bar around 10:30 or 10:45 p.m.  Officers were unable to determine whether defendant obtained more alcohol between the time he left the Hen House and the collision.

Interviewed by officers three days after the collision, defendant claimed he did not remember, and he did not admit, driving his silver pickup after the car show, going to the Hen House, or being involved in a collision.  Responding to officers' questions, defendant stated he never had blackouts, had never drunk to the point of having a blackout, and had never been diagnosed with diabetes.

From their investigation, officers determined defendant was traveling at a speed of 72 miles per hour five seconds before the collision. He did not take his foot off the accelerator until two seconds before the collision. During those last two seconds, defendant steered the truck sharply to the left. He oversteered, and the truck began to spin out of control. At the time of impact, the truck was traveling at about 65 miles per hour. Defendant never stepped on the brake.

Defendant has two prior convictions for driving under the influence. In 1993, he pleaded guilty to driving under the influence in violation of Vehicle Code section 23152, subdivision (a). As part of his probation, he attended and completed a four-month educational program for DUI offenders.

In 2001, defendant pleaded no contest to driving under the influence with a blood-alcohol level of .08 percent or more in violation of Vehicle Code section 23152, subdivision (b). He also admitted a special allegation under Vehicle Code section 23578 that his blood-alcohol level was .20 percent or more. As a condition of his 36-month probation, defendant attended and completed a six-month educational program for DUI offenders who drove with a blood-alcohol level of .20 or more.

Defendant was still on probation on April 10, 2004, when this accident occurred. As a condition of that probation, defendant had agreed not to drive with any measurable amount of alcohol in his system.

## DEFENSE

Two individuals who conversed with defendant at the Hen House bar that evening testified defendant did not appear intoxicated to them. The Hen House bartenders also testified defendant did not appear to them to be intoxicated.

Defendant challenged the accuracy of the blood-alcohol test. The blood sample was not refrigerated from the time police dropped it into the mailbox on April 11 until it was received at the lab on April 13. Expert witnesses for defendant testified the blood could ferment if there was insufficient preservative or a lack of refrigeration, causing the production of alcohol in the blood sample and raising the alcohol content to a level higher than what existed at the time the sample was taken.

One expert, a forensic alcohol analyst, testified that if a 46-year-old, 190-pound individual drank six 12-ounce beers between 5:00 p.m. and 11:00 p.m., his blood-alcohol level at 11:15 p.m. would be approximately .04 percent.

Defense expert witnesses testified a diabetic experiencing an episode of low blood sugar, or hypoglycemia, can experience a

sudden onset of many of the symptoms of intoxication, including slurred speech, motor imbalance, and unconsciousness.  One expert stated hypoglycemia may cause a process called ketosis, in which the body metabolizes fatty acids.  That process may produce measurable alcohol in the body.

Defendant's physician, Dr. John Moore, testified he performed a glucose tolerance test on defendant in May 2004 after the collision, and for the first time diagnosed defendant as having impaired glucose intolerance and suffering from metabolic syndrome.  Metabolic syndrome is a prediabetic condition that consists of mild obesity, hypertension, elevated triglycerides, low good cholesterol or HDL, and commonly an impairment of blood sugar control to some extent.  A person with metabolic syndrome who consumes alcohol without eating food could suffer a hypoglycemic episode.

Based on the blood test, his prior knowledge of defendant's medical condition, his physical examination of defendant, and defendant's description of the events, Moore testified it was his opinion defendant suffered a hypoglycemic episode at the time of the collision and lost consciousness.  Defendant's loss of consciousness could explain why he lost control of the truck and also why he had no memory of the events.  The memory loss could last until the blood sugar was raised again, such as by a stress event like the collision.  Memory loss after the collision thus would not have been caused by a hypoglycemic episode.  Also, an extended memory loss from 5:30 p.m. to 2:30 a.m. the next day suffered by someone such as defendant would not be caused by a hypoglycemic episode, although an episode could occur at some point during that period of time.

/////

Opinion at 2-10.

On February 9, 2005, the jury found petitioner guilty of murder in the second degree, vehicular manslaughter while intoxicated, and hit and run causing death or permanent serious injury.  Reporter's Transcript ("RT") at 1579-80.  The jury also found true an allegation of hit and run during the commission of a gross vehicular manslaughter while intoxicated.  Id. at 1579.  The trial judge sentenced petitioner to a term of 15 years to life, plus a consecutive term of four years.  Id. at 1625.

     B.    Post Trial Proceedings

Petitioner filed a timely appeal with the California Court of Appeal, Third Appellate District on October 14, 2005.  Answer, Lodged Doc. 1 at 1.  That appeal was

1  denied in a reasoned opinion on November 6, 2006.  Opinion at 31.  On December 1, 2006,

2  petitioner petitioned the California Supreme Court for review of that decision.  Answer, Lodged

3  Doc. 5.  The California Supreme Court summarily denied that petition on February 23, 2007.

4  Answer, Lodged Doc. 6.  Petitioner filed this federal petition on March 17, 2008.

5  /////

6  IV.   APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

7        An application for a writ of habeas corpus by a person in custody under a

8  judgment of a state court can be granted only for violations of the Constitution or laws of the

9  United States.  28 U.S.C. § 2254(a).

10        Federal habeas corpus relief is not available for any claim decided on the merits

11  in state court proceedings unless the state court's adjudication of the claim:

12        (1) resulted in a decision that was contrary to, or involved an
          unreasonable application of, clearly established federal law, as
13        determined by the Supreme Court of the United States; or

14        (2) resulted in a decision that was based on an unreasonable
          determination of the facts in light of the evidence presented in the
15        State court proceeding.

16   28 U.S.C. § 2254(d).

17        Although "AEDPA does not require a federal habeas court to adopt any one

18  methodology," Lockyer v. Andrade, 538 U.S 63, 71 (2003), there are certain principles which

19  guide its application.

20        First, the "contrary to" and "unreasonable application" clauses are different.  As

21  the Supreme Court has explained:

22        A federal habeas court may issue the writ under the "contrary to"
          clause if the state court applies a rule different from the governing
23        law set forth in our cases, or if it decides a case differently than we
          have done on a set of materially indistinguishable facts.  The court
24        may grant relief under the "unreasonable application" clause if the
          state court correctly identifies the governing legal principle from
25        our decisions but unreasonably applies it to the facts of the
          particular case.  The focus of the latter inquiry is on whether the
26        state court's application of clearly established federal law is

7

1
2

> objectively unreasonable, and we stressed in <u>Williams [v. Taylor</u>, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

3  <u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002).  It is the habeas petitioner's burden to show the state

4  court's decision was either contrary to or an unreasonable application of federal law.  <u>Woodford</u>

5  <u>v. Visciotti</u>, 537 U.S. 19, 123 S. Ct. 357, 360 (2002).  It is appropriate to look to lower court

6  decisions to determine what law has been "clearly established" by the Supreme Court and the

7  reasonableness of a particular application of that law.  <u>See</u> <u>Duhaime v. Ducharme</u>, 200 F.3d 597,

8  598 (9th Cir. 2000).

9          Second, the court looks to the last reasoned state court decision as the basis for

10  the state court judgment.  <u>Avila v. Galaza</u>, 297 F.3d 911, 918 (9th Cir. 2002).  So long as the

11  state court adjudicated petitioner's claims on the merits, its decision is entitled to deference, no

12  matter how brief.  <u>Lockyer</u>, 538 U.S. at 76; <u>Downs v. Hoyt</u>, 232 F.3d 1031, 1035 (9th Cir. 2000).

13          Third, in determining whether a state court decision is entitled to deference, it is

14  not necessary for the state court to cite or even be aware of the controlling federal authorities "so

15  long as neither the reasoning nor the result of the state-court decision contradicts them." <u>Early v.</u>

16  <u>Packer</u>,  537  U.S. 3, 8 (2003).  Moreover, a state court opinion need not contain "a formulary

17  statement" of federal law, so long as the fair import of its conclusion is consonant with federal

18  law.  <u>Id</u>.

19  /////

20  /////

21  V.      <u>DISCUSSION OF PETITIONER'S CLAIMS</u>

22          A.      <u>Jury Instruction Regarding Consciousness</u>

23                  1)      <u>Description of Claim</u>

24          During jury instruction the trial judge issued California Jury Instruction

25  ("CALJIC") 4.31 stating:

26          If the evidence establishes beyond a reasonable doubt that at the

1

> time of the commission of the alleged crime the defendant acted as
> if he were conscious, you should find that he was conscious, unless
> from all the evidence you have a reasonable doubt that the
> defendant was in fact conscious at the time of the alleged crime.
>
> If the evidence raises a reasonable doubt that the defendant was in
> fact conscious, you must find that he was then unconscious.

Clerk's Transcript ("CT") at 628.  Petitioner argues this instruction "improperly allowed the jury

to presume a factor which was essential to the state's case" in violation of his Fifth and Sixth

Amendment rights.  Petition at 21-22.  Petitioner acknowledges that the California Supreme

Court upheld CALJIC 4.31 in People v. Babbit, 45 Cal. 3d 660, 693 (Cal. 1998), but argues that

Babbit is no longer good law because of the United States Supreme Court's decisions in Blakely

v. Washington, 542 U.S. 296 (2004); Ring v. Arizona, 536 U.S. 584 (2002); Apprendi v. New

Jersey, 530 U.S. 466 (2000); and Jones v. United States, 526 U.S. 227 (1999).  Petition at 25.

2)   State Court Opinion

 The California Court of Appeal rejected this claim stating:

> Our Legislature has determined proof of consciousness is not
> essential to establishing the crime of murder.  It does not impose
> additional punishment on a defendant based merely on the fact he
> was conscious when he committed the other elements of a crime.
> Nothing in *Blakely, Ring, Apprendi* or *Jones* requires us to
> question that determination.  The rule of *Babbitt* remains good law,
> and the trial court committed no error in instructing the jury with
> CALJIC No. 4.31.

Opinion at 3-4.

3)   Applicable Law

A challenge to jury instructions does not generally state a federal constitutional

claim.  See Middleton v. Cupp, 768 F.2d at 1085 (citing Engle, 456 U.S. at 119); Gutierrez v.

Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  Habeas corpus is unavailable for alleged error in

the interpretation or application of state law.  Middleton, 768 F.2d at 1085; see also Lincoln v.

Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir.

1986).  However, a "claim of error based upon a right not specifically guaranteed by the

9

1   Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so

2   infects the entire trial that the resulting conviction violates the defendant's right to due process."

3   Hines v. Enomoto, 658 F.2d 667, 672 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th

4   Cir. 1980)).  See also Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (To prevail on such

5   a claim petitioner must demonstrate that an erroneous instruction "so infected the entire trial that

6   the resulting conviction violates due process.")  The analysis for determining whether a trial is

7   "so infected with unfairness" as to rise to the level of a due process violation is similar to the

8   analysis used in determining, under Brecht, 507 U.S. at 623, whether an error had "a substantial

9   and injurious effect" on the outcome.  See McKinney v. Rees, 993 F.2d 1378, 1385 (9th Cir.

10  1993).

11          In order to warrant federal habeas relief, a challenged jury instruction "cannot be

12  merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due

13  process right guaranteed by the fourteenth amendment."  Prantil, 843 F.2d at 317 (quoting Cupp

14  v. Naughten, 414 U.S. 141, 146 (1973)).  In making its determination, this court must evaluate

15  the challenged jury instructions "'in the context of the overall charge to the jury as a component

16  of the entire trial process.'"  Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228,

17  1239 (9th Cir. 1984)).  The United States Supreme Court has cautioned that "not every

18  ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process

19  violation."  Middleton v. McNeil, 541 U.S. 433, 437 (2004).  Further, in reviewing an allegedly

20  ambiguous instruction, the court "must inquire 'whether there is a reasonable likelihood that the

21  jury has applied the challenged instruction in a way' that violates the Constitution."  Estelle, 502

22  U.S. at 72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)).  See also United States v.

23  Smith, 520 F.3d 1097, 1102 (9th Cir. 2008).

24          4)      Discussion

25          The prosecution in a criminal case has the burden of proving each and every

26  element of the crime charged beyond a reasonable doubt.  In re Winship, 397 U.S. 358, 364

1  (1970).  The California legislature's decision on how to define the elements of the crime is

2  however "usually dispositive," McMillan v. Pennsylvania, 477 U.S. 79, 85 (1986), and

3  consciousness is not an element of murder but is instead presumed under California law.[2]  People

4  v. Boyes, 149 Cal.App. 3d 812, 817-21 (1983).  Lack of consciousness, or unconsciousness, is

5  however a potential defense under California law.  Id.  The instruction at issue did not therefore

6  allow the jury to presume an element of the charged offense or alter the prosecution's burden of

7  proof.  Additionally, the cases cited by petitioner are not applicable.

8          The Blakely, Ring, Apprendi, and Jones cases hold that any fact, other than a

9  prior conviction, which increases a penalty for a crime above the statutory maximum must be

10  proven beyond a reasonable doubt to a jury.  Blakely, 542 U.S. at 301 (quoting Apprendi, 530

11  U.S. at 490).  These cases concern the maximum penalty which may be imposed upon a murder

12  conviction, but do not affect the specific elements of proof necessary for such conviction.

13          According to petitioner, "[a] central issue for the jury in this case was whether

14  [petitioner] was unconscious at the time of the accident."  Petition at 24.  As a defense

15  unconsciousness was a central issue as petitioner's physician testified that he believed petitioner

16  had suffered a hypoglycemic episode and lost consciousness just before the collision.  RT at

17  1253.  The trial judge was justified in issuing a pattern jury instruction to aid the jury in

18  evaluating the evidence as it related to this defense.  It does not appear that either side objected

19  to the instruction nor is there any evidence of record that the instruction had "a substantial and

20  injurious effect" on the outcome of petitioner's trial.

21          Petitioner has not shown that giving the instruction at issue was an error or so

22  infected his trial with unfairness that the conviction violated his right to due process and he is

23  therefore not entitled to relief on this claim.

24  /////

25

26      [2] "Murder is the unlawful killing of a human being, or a fetus, with malice aforethought."
CAL. PENAL CODE § 187(a).

B.     Jury Instruction Regarding Intoxication

1)     Description of Claim

Under California Penal Code Section 22, voluntary intoxication does not render a criminal act less criminal.  CAL. PENAL CODE § 22.  Accordingly the trial judge instructed the jury that:

> It is the general rule that no act committed by a person while in the state of voluntary intoxication is less criminal by reason of that condition.
> Thus in the crimes charged in counts 1, 2, 4, and 5 and the lesser crimes thereto, the fact that the defendant was voluntarily intoxicated is not a defense and does not relieve the defendant of the responsibility for the crime.  This rule applies only to the crime[s] charged in counts 1, 2, 4, and 5 and the lesser crimes thereto.

RT at 1404.

Petitioner argues that instructing the jury on California Penal Code § 22 was unconstitutional because it excluded relevant exculpatory evidence and deprived him of his right to present evidence in his defense.  Petition at 26-36.  Petitioner cites Montana v. Egelhoff, 518 U.S. 37 (1996), in support of his argument.  Id.

2)     State Court Opinion

In rejecting this claim the California Court of Appeal stated:

> Defendant contends section 22 violates his due process right to introduce relevant evidence proving he did not harbor the required mental state of implied malice.  He relies on the concurring opinion in Egelhoff to support his argument.  We disagree with his contention.
>
> The Egelhoff four-justice plurality held that a defendant's right to have a jury consider evidence of voluntary intoxication on the mental state required for the offense was not a "fundamental principle of justice."  Thus, a Montana law precluding consideration of a defendant's voluntary intoxication on the required mental state did not violate due process.  (Egelhoff, supra, 518 U.S. at pp. 39-43, 48-51, 56.)
>
> In a concurring opinion, Justice Ginsburg stated a statute that "is simply a rule designed to keep out 'relevant, exculpatory evidence' " would offend due process.  (Egelhoff, supra, 518 U.S. at p. 57 (conc. opn. of Ginsburg, J.).)  On the other hand, if the statute

redefined "the mental-state element of the offense," it would not violate due process. She concluded the Montana statute was the latter. (<u>Ibid</u>.)

Defendant asserts because <u>Egelhoff</u> was decided on a five-to-four vote, and Justice Ginsburg concurred on narrower grounds than the plurality, her position is controlling. (<u>See</u> <u>Romano v. Oklahoma</u> (1994) 512 U.S. 1, 9; <u>Marks v. United States</u> (1977) 430 U.S. 188, 193.) He claims section 22, unlike the Montana statute at issue in <u>Egelhoff</u>, did not redefine the mens rea requirement of murder, but simply precluded relevant, exculpatory evidence. Under Justice Ginsberg's analysis, he argues, such a rule violated his due process rights.

Defendant's contention is meritless. In the first place, the constitutional challenge he raises was rejected in <u>People v. Martin</u> (2000) 78 Cal.App.4th 1107 (<u>Martin</u>). After analyzing the history of section 22, as set forth by our Supreme Court in <u>People v. Mendoza</u> (1998) 18 Cal.4th 1114, and the cases applying it, the court in <u>Martin</u> concluded: "The 1995 amendment to section 22 results from a legislative determination that, for reasons of public policy, evidence of voluntary intoxication to negate culpability shall be strictly limited. We find nothing in the enactment that deprives a defendant of the ability to present a defense or relieves the People of their burden to prove every element of the crime charged beyond a reasonable doubt...." (<u>Martin</u>, <u>supra</u>, 78 Cal.App.4th at p. 1117.)

Section 22 is simply not the type of evidence-exclusionary statute to which Justice Ginsburg and the dissent in <u>Egelhoff</u> expressed due process concerns. It is part of the Penal Code and reflects California's long history of limiting the exculpatory effect of voluntary intoxication. (See, e.g., <u>People v. Hood</u> (1969) 1 Cal.3d 444, 455-458.) [FN] The first sentence of section 22, subdivision (a), providing that an act is not less criminal when committed by a voluntarily intoxicated person, embodies a legislative decision that an intoxicated person bears criminal culpability in the same manner as a sober person. The second sentence, concerning the capacity to form a mental state, is also a statement of substantive law precluding voluntary intoxication as a basis for a diminished capacity defense. Section 22, subdivision (b), completes the statutory scheme by establishing the exculpatory effect of voluntary intoxication on the mental state required for a criminal offense. It permits evidence of voluntary intoxication on the issue of whether a defendant has a specific intent, including whether a defendant murdered with premeditation, deliberation, or express malice aforethought. As a policy decision, however, it determines that voluntary intoxication shall have no exculpatory effect in the case of a murder charge based on the mental state of implied malice. Section 22, subdivision (b), does not lessen the prosecution's burden of proof or prevent a defendant from presenting all relevant evidence in defense.

FN. As the plurality in <u>Egelhoff</u> explained, a prohibition of consideration of voluntary intoxication in the determination of mens rea has "considerable justification," as many as half of all homicides may be committed by intoxicated offenders, deters drunkenness or irresponsible behavior while drunk, serves as a specific deterrent to those who prove incapable of controlling violent impulses while voluntarily intoxicated by assuring they go to prison, and "comports with and implements society's moral perception that one who has voluntarily impaired his own faculties should be responsible for the consequences." (<u>Egelhoff</u>, <u>supra</u>, 518 U.S. at pp. 49-50.)

Our Supreme Court has not addressed the precise question before us, but has left little reason to suspect it would embrace defendant's position.  To the contrary, in <u>People v. Atkins</u> (2001) 25 Cal.4th 76, the court concluded that, pursuant to section 22, evidence of voluntary intoxication is not admissible as to whether the defendant formed the required mental state for arson, because arson is a general intent crime.  (<u>Id</u>. at p. 79.)  In reaching its decision, the court expressed the following: "Finally, we *reject* defendant's argument that the withholding of voluntary intoxication evidence to negate the mental state of arson violates his due process rights by denying him the opportunity to prove he did not possess the required mental state.  (<u>Montana v. Egelhoff</u> (1996) 518 U.S. 37, 39-40, 56 [135 L.Ed.2d 361].)"  (<u>People v. Atkins</u>, <u>supra</u>, 25 Cal.4th at p. 93, italics added.)
Defendant has failed to demonstrate constitutional error.

/////

Opinion at 17-21.

/////

      3)    <u>Applicable Law and Discussion</u>

In short, under California law, *involuntary* lack of consciousness, for example due to a disease, is a defense which refutes the presumption of consciousness.  *Voluntary* lack of consciousness, for example due to voluntary intoxication, is not a defense.

No United States Supreme Court decision has held that California Penal Code § 22 violates a fundamental Constitutional right.  The decision of the California Court of Appeal was entirely consistent with the holding of the plurality in <u>Egelhoff</u> that due process does not prevent a state from disallowing consideration of voluntary intoxication when a defendant's state of mind is at issue.  <u>Egelhoff</u>, 518 U.S. at 56.

14

1    Thus the decision of the California Court of Appeal was not "contrary to, or

2  involved an unreasonable application of, clearly established Federal law, as determined by the

3  Supreme Court of the United States" nor was it "based on an unreasonable determination of the

4  facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d);

5  Williams v. Taylor, supra; see Lockyer v. Andrade, supra.  Petitioner is therefore not entitled to

6  relief on this claim.

7    C.    Prosecutorial Misconduct

8        1)    Description of Claim

9    During closing arguments the prosecutor used the example of a "soccer mom or

10  soccer dad" to contrast petitioner's actions with those of one more deserving of a conviction of

11  manslaughter.  The prosecutor stated:

12        If you have that soccer person, you know, who is drinking at home,
         is under the influence, you know, and drives recklessly to get to
13        her son's soccer practice, and she has never been arrested before,
         never had any drunk driving convictions, that's what she's guilty
14        of, but how do you give her the same thing that you give this
         defendant?  You can't, because there is so much more in this case
15        than that soccer mom who had too much to drink, who has never
         had - - been arrested before, never went to DUI schools, you know,
16        and drove recklessly.  She committed this offense, but you can't - -
         you can't give this defendant the same conviction that you would
17        give that first time soccer mom or the first time 17-year old kid or,
         you know, the 60-year old man whose never been arrested for
18        anything and one night has too much to drink and drives
         recklessly.

19
                         * * *
20
         That's why this is different than that first time soccer mom or
21        soccer dad whose under the influence, drives recklessly and kills
         someone.  Never been in trouble before.  You know, didn't know
22        that, you know, four or five beers, you know, was going to make
         her such a danger to other people.
23
         This is not enough.  And if you convict the defendant of this and
24        not the murder, what are you telling that first time soccer person?
         That, hey, you are getting the same thing as Mr. Long?
25  /////

26  RT at 1446, 1449-50.  The prosecutor also told the jury that "Travis Bosse will never get to

                         15

1  graduate from high school.  He'll never get to go to college and wear his cap and gown and

2  graduate from college."  Id. at 1470.

3          Petitioner argues these statements constituted prosecutorial misconduct because

4  they commented on petitioner's punishment and made an appeal to the jury for sympathy.

5  Petition at 37-40.

6          2)      State Court Opinion

7          The California Court of Appeal reject this claim stating:

8          "[P]unishment is not a proper matter for jury consideration."
           (People v. Holt (1984) 37 Cal.3d 436, 458.)  However, the
9          prosecutor here did not place the issue of punishment before the
           jury with his remarks.  He argued defendant should be convicted of
10         the more serious offense charged, murder, on the basis of the facts
           of this case, not because he would suffer a greater punishment.
11         The prosecutor may argue the evidence shows the defendant is
           guilty of all of the elements of the charged crime.  (People v.
12         Mincey (1992) 2 Cal.4th 408, 447-448.)  Comparing these facts
           and elements to those of a less serious crime does not necessarily
13         result in the prosecutor improperly arguing punishment to the jury.

14                                              * * *

15         "As a general rule a defendant may not complain on appeal of
           prosecutorial misconduct unless in a timely fashion-and on the
16         same ground-the defendant made an assignment of misconduct and
           requested that the jury be admonished to disregard the
17         impropriety."  (People v. Samayoa, supra, 15 Cal.4th at p. 841.)
           Although defense counsel objected to the prosecutor's statement,
18         he did not request a jury admonition.  He thus forfeited the
           argument here.

19         Even were we to consider the claim, we would conclude the
           remark was not prejudicial.  It is unlikely the jury would have
20         reached a verdict more favorable to defendant had the remark not
           been made.  (People v. Kipp (2001) 26 Cal.4th 1100, 1130.)  The
21         prosecutor's comment was brief, and he did not return to that
           theme after the objection was raised.
22
           Moreover, the jury was properly instructed to decide the case on
23         the facts and law, not the statements made by trial counsel.  It was
           told it "must not be influenced by sentiment, conjecture, sympathy,
24         passion, prejudice, public opinion or public feeling."  Defendant
           suffered no prejudice as a result of the remark.
25  /////

26  Opinion at 23-25.

3)    <u>Applicable Law</u>

Habeas corpus relief will be granted on grounds of prosecutorial misconduct only when it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Darden v. Wainwright</u>, 477 U.S. 168, 171 (1986) (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974)); <u>see also</u> <u>Bonin v. Calderon</u>, 59 F.3d 815, 843 (9th Cir.1995) (holding that habeas corpus relief only can only be granted if the error "had substantial and injurious effect or influence in determining the jury's verdict.") (quoting <u>Brecht</u>, 507 U.S. at 622).  To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." <u>Greer v. Miller</u>, 483 U.S. 756, 765 (1987) (citations omitted).

Under this standard, a petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial, i.e., that absent the alleged impropriety, the verdict probably would have been different. <u>Id</u>.at 765-66; <u>United States v. Weitzenhoff</u>, 35 F.3d 1275, 1291 (9th Cir.1994). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor ... [T]he aim of due process 'is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused.' " <u>Smith v. Phillips</u>, 455 U.S. 209, 219 (1982) (quoting <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963)).  The standard of review for a claim of prosecutorial misconduct on a writ of habeas corpus is " 'the narrow one of due process, and not the broad exercise of supervisory power.' " <u>Darden</u>, 477 U.S. at 181 (quoting <u>Donnelly</u>,416 U.S. at 642).

4)    <u>Discussion</u>

Immediately after the prosecutor made the "soccer person" analogy petitioner's counsel objected.  RT at 1450.  The trial court sustained the objection stating, "[w]ell, stay away, very carefully, counsel, from anything relating to penalties, punishment.  This jury is not to consider that.  When you start talking about what somebody is getting, you are too close to that."

17

1 Id.  The prosecutor clarified his argument telling the jury, "[w]hen I say getting, I mean the

2 conviction on a charge."  Id.

3    The trial judge instructed the jury that they were not to consider petitioner's

4 penalty and the prosecutor clarified that his argument was not relating to petitioner's punishment

5 but his conviction.  Petitioner has failed to show this exchange affected the outcome of his trial.

6 With respect to petitioner's argument that the prosecutor appealed to the jury's sympathy during

7 closing arguments, respondent points out that petitioner forfeited this claim by failing to raise a

8 proper objection at trial.

9    The Ninth Circuit has recognized and applied the California contemporaneous

10 objection rule in affirming denial of a federal petition on grounds of procedural default where

11 there was a complete failure to object at trial.  See Inthavong v. Lamarque, 420 F.3d 1055, 1058

12 (9th Cir.2005); Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir.2004); Vansickel v. White,

13 166 F.3d 953, 957-58 (9th Cir.1999).  Nevertheless the California Court of Appeal also rejected

14 this claim on the merits, finding that is was "unlikely the jury would have reached a verdict more

15 favorable to defendant had the remark not been made."  There is no evidence of record to refute

16 that finding.

17    Petitioner has not established that absent either of the prosecutor's statements the

18 jury's verdict would have been different and he is therefore not entitled to relief on this claim.

19   D. New Trial Motion

20    1) Description of Claim

21    After the trial, petitioner moved to either set aside the verdict or reduce the

22 verdict to a conviction of only gross vehicular manslaughter while intoxicated, pursuant to

23 California Penal Code section 1181.  RT at 1601.  Petitioner argues that the trial court "applied a

24 fundamentally incorrect standard of review" under California Penal Code section 1181 in

25 denying that motion.  Petition at 41.

26 /////

2)      State Court Opinion

The California Court of Appeal rejected this claim stating:

> No abuse of discretion appears from the record.  "[T]he function of the trial judge in passing upon a motion for a new trial ... [is] to see that the jury intelligently and justly performs its duty and, in the exercise of a proper legal discretion, to determine whether there is sufficient credible evidence to sustain the verdict ."  (People v. Robarge, supra, 41 Cal.2d at p. 634.)  The court's conclusion there was sufficient evidence to support the murder conviction does not imply the court reached that conclusion without independently weighing the evidence.
> The trial court heard all of the evidence, saw the witnesses testify, listened to arguments of counsel, and determined there was "no good cause" and "no basis" for granting defendant a new trial.  By concluding "[t]he evidence was more than ample to support this verdict," the trial court exhibited it had applied the correct standard, weighed the evidence, and found defendant's claims lacking.  The court did not abuse its discretion in denying the motion.

Opinion at 28.

3)      Applicable Law and Discussion

The state appellate court's conclusion that the trial court applied the correct standard under Cal. Penal Code § 1181 is binding.  See Estelle, 502 U.S. at 67-68 (a federal writ is not available for alleged error in the interpretation or application of state law); Aponte v. Gomez, 993 F.2d 705, 707 (9th Cir. 1993) (federal courts are "bound by a state court's construction of its own penal statutes"); Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir. 1989) (a federal habeas court must defer to the state court's construction of its own penal code unless its interpretation is "untenable or amounts to a subterfuge to avoid federal review of a constitutional violation").

To the extent petitioner argues a violation of due process, the argument consists of a single paragraph in a footnote of the petition.[3]  That argument is vague and conclusory and

---

[3] Petitioner states:

> Moreover, although the right is statutory in origin, there is a federal Due Process component to the trial court's error as well.

19

1  should be rejected on that basis.  See Jones v. Gomez, 66 F.3d 199, 204 (9th Cir. 1995) (quoting

2  James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994)) ("'[c]onclusory allegations which are not

3  supported by a statement of specific facts do not warrant habeas relief'").

4          Petitioner has not presented a cognizable federal issue and is therefore not entitled

5  to relief on this claim.

6      E.      Shackling

7          1)      Description of Claim

8          At the trial petitioner was restrained from movement by a leg brace.  RT at 69.

9  Petitioner argues this restraint violated his right to the presumption of innocence and to the

10 effective assistance of counsel.  Petition at 50.

11         2)      State Court Opinion

12         The California Court of Appeal rejected this claim stating:

13         "It is settled that the use of physical restraints in the trial court
           cannot be challenged for the first time on appeal.  Defendant's
14         failure to object and make a record below waives the claim here."
           (People v. Tuilaepa (1992) 4 Cal.4th 569, 583.)
15
16         Defendant admits his trial counsel did not object to the restraint,
           but claims in a footnote we must address the merits of his
17         argument under the rubric of ineffective assistance of counsel.
           Even were that so, the Supreme Court has "consistently found any
18         unjustified or unadmonished shackling harmless where there was
           no evidence it was seen by the jury."  (People v. Tuilaepa, supra, 4
19         Cal.4th at pp. 583-584.)  The only evidence in the record here
           shows the leg brace was not visible to the jury.  Defendant does
20         not argue to the contrary.  Thus, he cannot establish the required

21         _____

22         The Supreme Court has made clear that the arbitrary deprivation of
           a state created right can itself violate Due Process.  (Hicks v.
23         Oklahoma (1980) 447 U.S. 343.)  Here, defendant had a state
           created right to an independent review of the evidence by a
24         factfinder not bound - - as an appellate court is - - by the jury's
           findings.  The trial court's failure to apply the correct standard
25         deprived defendant of this valued right.  Due Process has been
           violated.  Review is appropriate for this constitutional violation as
           well.
26
   Petition at 47.

1    showing of prejudice in order to succeed on a claim of ineffective
2    assistance.  (Strickland v. Washington (1984) 466 U.S. 668, 684-
     686.)

3    Opinion at 30-31.

4        3)    Applicable Law

5        Shackling a criminal defendant is "inherently prejudicial." Deck v. Missouri, 544

6    U.S. 622, 125 S.Ct. 2007, 2011 (2005) (quoting Holbrook v. Flynn, 475 U.S.560, 568 (1986)).

7    "Thus, the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the

8    jury absent a trial court determination, in the exercise of its discretion, that they are justified by a

9    state interest specific to a particular trial. Deck, 125 S.Ct. at 2012.  However, a jury's brief or

10   inadvertent glimpse of a defendant in physical restraints outside of the courtroom is not

11   inherently or presumptively prejudicial.  See e.g., Ghent, 279 F.3d at 1132 (jurors' view of

12   defendant in the hallway and being transported in restraints on several occasions not unduly

13   prejudicial); United States v. Olano, 62 F.3d 1180, 1190 (9th Cir.1995) (same).  In cases where

14   jurors observe a defendant in shackles outside of the courtroom, actual prejudice must be

15   demonstrated.  Wilson v. McCarthy, 770 F.2d 1482, 1485-86 (9th Cir.1985) (a jury's brief,

16   inadvertent observation of a defendant in custody does not compel reversal in the absence of an

17   affirmative showing of actual prejudice); United States v. Halliburton, 870 F.2d 557, 560-61 (9th

18   Cir.1989) (same).  See also Dupont v. Hall, 555 F.2d 15, 17 (1st Cir.1977) (noting that even the

19   "most unsophisticated juror" knows that defendants may have to post bail and that some lack the

20   resources to do this); United States v. Leach, 429 F.2d 956, 962 (8th Cir.1970) ("[i]t is a normal

21   and regular as well as a highly desirable and necessary practice to handcuff prisoners when they

22   are being taken from one place to another, and the jury is aware of this").

23   /////

24       4)    Discussion

25       Respondent notes that petitioner failed to object to his shackling before the trial

26   court and therefore, as the California Court of Appeal found, has procedurally defaulted this

claim.  As previously stated, the Ninth Circuit has recognized and applied the California

contemporaneous objection rule in affirming denial of a federal petition on grounds of

procedural default where there was a complete failure to object at trial.  See Inthavong, 420 F.3d

at 1058; Paulino, 371 F.3d at 1092-93; Vansickel, 166 F.3d at 957-58.

Nevertheless the California Court of Appeal also rejected petitioner's claim on

the merits, noting that he did not object during the trial and that the record shows the brace was

not visible to the jury.  According to the trial transcripts petitioner agreed to wear the leg brace

and it was not visible to anyone.

> THE COURT: Okay.  Let me go through a couple of other items I
> wanted to discuss.  I know, only because I asked a member of my
> staff, that Mr. Long is in custody.  I can't tell that from looking at
> him.  He's in civilian clothes.  I can't tell the nature of the
> restraining device that's on your client, what is it Mr. Strotter
> [defense counsel]?
>
> MR. STROTTER: It's the - - I believe, the foot - - the foot clasp or
> foot bracelet.  There's a - - there's some sort of boot under his
> pants.
>
> THE COURT: It's not a leg brace?
>
> THE BAILIFF: Leg brace, your Honor.
>
> THE COURT: Leg brace.  And are you comfortable with that, Mr.
> Long?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Okay.  The advantage of that is that nobody can tell
> you have it on.  The only possible way they could make an
> inference that you have it on is if you were to stand and try to walk
> about that courtroom with jurors present, because they might note
> that you have somewhat of an unnatural gait.  At least many people
> do when they wear those devices.  So if you'd avoid walking
> around the courtroom when jurors are here.  You can certainly
> stand, turn around when I introduce you to jurors.  That shouldn't
> be a problem.  But avoid standing up.  And that's for a number of
> reasons.  If you stand up and start moving around and the bailiffs
> don't know why, they might help you back to your seat.  But, more
> importantly, jurors won't pick up that you might be in custody.
> And I assume, Mr. Strotter, you prefer jurors not know your client
> is in custody?

1      MR. STROTTER: Yes, your Honor.  And I have no problem with
       the restraints in place at this time.

2   /////

3   RT at 68-69.

4           The record explicitly refutes petitioner's claim that the restraint violated his right

5   to the presumption of innocence.  Further, there is no evidence the restraint rendered his

6   counsel's assistance ineffective.  Petitioner is therefore not entitled to relief on this claim.

7   VI.     <u>CONCLUSION</u>

8           Accordingly, IT IS HEREBY RECOMMENDED that petitioner's petition for a

9   writ of habeas corpus be denied.

10          These findings and recommendations are submitted to the United States District

11  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

12  days after being served with these findings and recommendations, any party may file written

13  objections with the court and serve a copy on all parties.  Such a document should be captioned

14  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

15  shall be served and filed within ten days after service of the objections.  The parties are advised

16  that failure to file objections within the specified time may waive the right to appeal the District

17  Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

18  DATED: June 17, 2009

19                          _Charlene H. Sorrentino_
                            CHARLENE H. SORRENTINO
20                          UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26

                                    23